Caruthers, J.,
delivered the opinion of the Court.
*93 Asbury Nichols, now deceased, the husband of Mary, and the father of the other complainants, was in jail in 1849, in Cocke county, on a charge of counterfeiting. Being anxious to procure bail, and for the purpose of qu-üifying a friend named Aaron R. Clark to become such, by making him a freeholder, on the 22d of October, he made him a deed for his land under a parol agreement, that he should become bail for himself, and his fellow prisoner, Bugg, one or both. It is clearly shown by the proof, that there was no other consideration for the deed, although it purports on its face to be for $400, then paid. On the disclosure of these facts to the Court, Clark was refused as bail, and at the next January Term of the Circuit Court, Nichols was convicted and sent to the penitentiary, where he, in a short time, died. Clark took possession of the land with the family of Nichols, and soon after conveyed it to defendants. Cabe, who was his step-son, was very young, and without means. Before the filing of this bill, in March, 1855, Clark left the country, and has not since returned. There can be no doubt but that the conveyances were both without any valuable consideration, and the latter with full knowledge of the nature and objects of the former. For this reason, as well as because of the want of consideration, Cabe cannot occupy the position of innocent purchaser, but must stand in the shoes of Clark. It is also very clear from the proof, that Clark was only to hold for the purpose.of qualifying him to be taken as appearance bail, and for his indemnity as such. It was, in substance, a mortgage to qualify him for, and secure him against the liability he was about to incur as bail. It is proved, that by the understanding of both parties, he was only to hold the land as long as it was necessary for those purposes. If then, the risk was never incurred, or if it had been, and he saved harmless by the appearance of Nichols, his title would fail, as in case of a mortgage paid off, or rather where the injury or loss against which it was intended to secure the mortgage had not fallen upon him, or had never been incurred. If it be competent, by parol, to raise such trusts and conditions against an absolute *94 deed, which, whatever we may think of its policy, in view of the statute of frauds, is now too well established to be controverted^ this is one of the clearest cases for the application of the doctrine. Nothing was paid, or ever intended to be paid, no risk was run, and no damage sustained, by Clark It would be iniquitous to allow him to retain the land against the complainants, if the merits of the case can be reached. But the defence is not placed upon the merits, but upon a sound and well approved legal rule, which, in cases to which it applies, repels parties from courts of justice, and closes the doors against them, no matter how great their wrongs may have been. This is where the party has been guilty of, or contemplated in the particular matter, some fraudulent, criminal or immoral act, some breach of good morals, or where the act was in violation of some rule of public policy. In such cases the Courts will not interpose, but leave the parties without redress, whatever claims they may have upon each other.
In this case the Chancellor based his action in dismissing the bill, upon the ground, that the object in conveying to Clark was improper, and against public policy. We do not give it that complexion. That the cause of the act done was to make Clark a freeholder, and as such, qualified to become bail, is clear. But was there anything wrong in that ? If he had been received without the deed, the land would have been bound in the hands of Nichols, and if after the deed, it would be bound in his hands. The land, in either case, would stand as a security for the penalty of any recognizance or hail bond that might be taken. The purpose was to put Clark in condition to be taken by the Court, by making him a freeholder, which they thought to be indispensable, and, perhaps, such was the practice of the Court. What fraud was that intended to perpetrate ? It could make no difference whether he paid anything for it or not, the land would have been equally bound to the State. No imposition was or could have been practiced upon any one. It is not unusual or contrary to public policy for a criminal to give bail, or to endeavor to procure bail, by conveying his property to others, to render them responsible for *95 the penalties to be incurred. If Clark had been otherwise good, and this land had been expressly mortgaged in due form, or in any legal mode, for his security, there could have been no objections. What difference can it make where there was the double object of both qualifying and securing him? It is said that the object was to induce Clark to commit perjury before the Court, when offered as bail, by stating that the land was his. This was not at all necessary. It was sufficient that he had title to the land so as to bind it under his recognizance. It was only important to the State that he had such a title as would subject the land in case of forfeiture. Nothing else was necessary to be stated to accomplish the objects intended. No necessity for false swearing was imposed by the transaction.
It is also insisted that the whole scheme was to get the criminal out upon bail, that he might make his escape from justice. If that were so, it would be such an unlawful purpose as would stain the hands of all concerned, and exclude them from the Courts. But there is no evidence that such was the intention. From all that we can see, nothing more was designed than to be admitted to bail in the ordinary way, and for the common reasons. We are not to strain presumptions to defeat equity and justice, by closing the doors against the injured. It ought to be a clear case of turpitude, or violation of public policy, to repel a party that has been wronged from the Courts of justice. The effect of applying the rule of repulsion in this case, would be to shield the defendants in a case of most glaring iniquity.
But there is another ground on which it is contended that the complainants should be repelled. The bill states that the title to the land was placed in Clark, or left in him, to protect the land from his creditors. The charge in the bill is that he, Nichols, “ owed some small debts, and fearing that his family might be distressed by them, and their house sold for little or nothing, during his imprisonment, he concluded to leave the title in said Clark.” If this were all, there would be a good ground for the argument, but the bill proceeds: “ instructing *96 said Clark that if any of his debts should be demanded during his absence, to pay them, by selling a portion of the land, if necessary. But for the purpose of enabling him to do this, without selling the land, he left a sufficiency of good claims in his hands for collection.” Instead of showing any intention to defraud creditors, by leaving the title in Clark, according to this statement, the object was to secure them, by applying the land, if necessary, in addition to the other means placed in his hands, as trustee. This shows that Clark was invested with the title, in the first instance, to qualify him legally to become bail for appearance of Nichols and Bugg, and not as purchaser; and in this we see nothing unlawful, oryn violation of public policy, or good morals; and when that purpose failed, he was to retain the title, not for himself, but for the benefit of creditors, and the helpless family of Nichols. The proof very clearly shows that this was the agreement and understanding of the parties, and that he was to retain the title no longer than it might be necessary for those purposes.
It is further said, that Clark removed some incumbrances from the land, resulting from some sale which had been made of it, under an execution or deed of trust, and has a deed from one Stokely for it. But if this be so, he must be held to have acted as trustee for Nichols, and can only claim to be refunded what he may have advanced out of Ms own funds. To ascertain how this is, and settle the amount between Clark, as trustee, and the complainants, there must be a reference to the Master. It is most likely, from what we see of the case, that neither Clark or Cabe have paid much, if anything, for the benefit of Nichols, out of their own means. But that will be open for investigation upon the reference. We think Cabe stands in no better situation, in any respect, than Clark, as he must have had full notice of all the equities of Nichols, and has not paid a consideration for the land, even if he had no notice.
Upon the whole we have no hesitation in granting relief to the complainants. Their misfortune in the inheritance of the disgrace of their ancestor, is not to preclude them from the *97 protection of the Courts, unless, indeed, Ms acts were such, in this particular transaction, as to repel him; in which case, they would he equally excluded. But this, we have seen, is not their unfortunate predicament, upon either of the grounds assumed, or any other ground in the case.
The decree of the Chancellor is reversed, and a decree will be made here settling the rights of the parties as herein declared, and the cause remanded for the account. The defendants will be charged with rents, but credited for valuable improvements so far as they advance the permanent value of the land, but not beyond the rents. Whatever the defendants may have paid to remove any real incumbrances, or buy in any legal or equitable outstanding title, out of their own means, and for which they have not been satisfied, must be allowed to them.